J-A15032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| FREUNDLICH & LITTMAN, LLC AND GREGORY CREED LITTMAN, ESQUIRE, | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| EDWARD T. FEIERSTEIN, BRUCE CHASAN, ESQUIRE AND THE LAW OFFICES OF BRUCE J. CHASAN, LLC | : : : : : : | No. 498 EDA 2020 |
| APPEAL OF: BRUCE CHASAN, ESQUIRE AND THE LAW OFFICES OF BRUCE J. CHASAN, LLC | : : : : | |

Appeal from the Order Entered January 14, 2020
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 150401569

BEFORE:  BOWES, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:               **FILED DECEMBER 14, 2021**

Bruce Chasan, Esquire, and The Law Offices of Bruce J. Chasan, LLC (collectively, "Chasan"), appeal from the Order denying his Motion for Reconsideration of the trial court's November 21, 2019, "Bench Order" in this abuse of process action.  We quash the appeal.

Pertinently, Chasan and Gregory Creed Littman, Esquire (together with Freundlich & Littman, LLC, hereinafter "Littman"), were opposing counsel in the underlying negligence action among neighboring condominium owners ("the condo action").  **See** Complaint, 4/16/15, Exhibit A (Condo Action Complaint).  Littman represented the plaintiffs, GJRPA, LP ("GJRPA"), and

Chasan represented the defendant, Edward Feierstein ("Feierstein"). Chasan filed a counterclaim on Feierstein's behalf, personally naming the principals of GJRPA and Littman as counterclaim defendants, and seeking attorneys' fees and expenses. *Id.*, Exhibit B (Answer, New Matter, and Counterclaim).

Littman subsequently sent Chasan a "Dragonetti Notice" (the "Dragonetti Letter"),[1] stating that the counterclaim was baseless and had been raised improperly. *Id.*, Exhibit C (Dragonetti Letter), at 1-3. Additionally, Littman alleged that Chasan and Freierstein were engaging in witness intimidation, citing the involvement of Littman's brother in Freierstein's criminal trial. *Id.* at 3. Littman requested that Chasan withdraw his counterclaim within 3 days. *Id.* at 4. Chasan responded with a letter stating, "The only thing [Freierstein] said that is printable is that he will not withdraw his counterclaim. He's not concerned if his counterclaim is bifurcated. As to

---

[1] Our Supreme Court has explained as follows:

> The Dragonetti Act[, 42 Pa.C.S.A. §§ 8351-8354,] is a codification of the common law cause of action for wrongful or malicious use of civil proceedings: a Dragonetti defendant may be held liable when he "takes part in the procurement, initiation or continuation of civil proceedings against another" and in doing so "acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based." 42 Pa.C.S.[A.] § 8351(a), (a)(1). For a successful claim under the Act, the underlying proceedings must have terminated in favor of the Dragonetti plaintiff. *Id.* § 8351(a)(2).

*Raynor v. D'Annunzio*, 243 A.3d 41, 52-53 (Pa. 2020).

the rest of your letter, I am not going to dignify it with any substantive response. Your letter is a thin-skinned rant." *Id.*, Exhibit D (Chasan's Letter). The two attorneys exchanged additional contemptuous letters throughout these proceedings.[2]

On April 16, 2015, Littman initiated the instant abuse of process action by filing a Complaint against Chasan and Feierstein. Littman alleged that Chasan and Feierstein had knowingly pursued a baseless lawsuit, and had "maliciously refused to discontinue" it, which caused Littman "great financial and emotional cost[.]" Complaint, 4/16/15, at 4. Littman sought compensatory and punitive damages. Chasan filed Preliminary Objections, seeking dismissal of Littman's Complaint, based on, *inter alia*, judicial

---

[2] Following the close of the condo action, Chasan filed a defamation action against Littman, alleging that Littman had published the Dragonetti Letter to third parties. The trial court granted summary judgment in favor of Littman, and dismissed the defamation action. This Court, finding that Chasan had waived his claims, subsequently affirmed the grant of summary judgment. *See Law Office of Bruce J. Chasan, LLC v. Freun[d]lich & Littman, LLC*, 188 A.3d 587 (Pa. Super. 2018) (unpublished memorandum). The Pennsylvania Supreme Court granted Chasan's Petition for allowance of appeal, reversed this Court's Order, and remanded for consideration of the merits of Chasan's claims. *See id.*, *appeal granted*, 197 A.3d 1178 (Pa. 2018). On remand, this Court again affirmed the trial court's Order granting summary judgment in favor of Littman and dismissing Chasan's defamation action, and our Supreme Court denied allowance of appeal. *See Chasan v. Littman*, 209 A.3d 535 (Pa. Super. 2019) (unpublished memorandum), *appeal denied*, 216 A.3d 1033 (Pa. 2019).

- 3 -

privilege.[3]  Littman filed an Answer, and the trial court ultimately sustained Chasan's Preliminary Objections based on judicial immunity.  Littman filed a Motion for Reconsideration, which the trial court denied.  On direct appeal, this Court concluded that judicial privilege does not apply to Littman's claim.  *See Freundlich & Littman*, 157 A.3d at 535.  Accordingly, on February 23, 2017, this Court vacated the trial court Order sustaining Chasan's Preliminary Objections and remanded the matter to the trial court.  *See id.*

Following further extensive litigation not relevant to the instant appeal, the case proceeded to a jury trial in June 2018.  On June 8, 2018, in the midst of trial, Chasan's counsel informed the trial court that the parties had reached a Settlement Agreement, which was read into the record as follows:

> [Littman] agrees to pay [Chasan] the sum of [sealed].
>
> The payments shall be made in the following payment terms:  [sealed] will be paid to [Chasan] **within 30 days of execution of a mutually acceptable release**, and then the remaining [sealed] shall be paid within 90 days thereafter.
>
> [Sealed.]

---

[3] This Court has explained judicial privilege as follows:

> The doctrine of judicial privilege provides absolute immunity for communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought.  The privilege … encompasses pleadings and even less formal communications such as … correspondence between counsel in furtherance of the client's interest.

*Freundlich & Littman, LLC v. Feierstein*, 157 A.3d 526, 530-31 (Pa. Super. 2017) (citations and quotation marks omitted).

- 4 -

The [S]ettlement [A]greement shall include no admission of liability or lack thereof.

The parties shall agree that the claims were fully disputed and that the purpose of the party settlement is to avoid the risk and expense and inconvenience of future litigation.

There will be **no confidentiality** for the [S]ettlement [A]greement.

The [S]ettlement [A]greement shall include a mutual release of all claims or future claims stemming from this lawsuit or the defamation lawsuit filed by [] Chasan, as well as the subject matter that those claims arise from.

And the release shall include the parties, their respective law firms, their employees, attorneys and their respective insurance companies, and those carriers and parties shall be specifically named in the release, and the release shall include all claims known or unknown that now exist or may exist in the future.

The current lawsuit filed by [Littman] shall be voluntarily discontinued with prejudice as against [Chasan].

We ask the [c]ourt to **retain jurisdiction** to enforce the settlement if there's a dispute between the parties or **to resolve any dispute that may arise regarding the finalization of the [S]ettlement [A]greement terms.**

The appeal that's currently pending in the defamation lawsuit shall be discontinued with prejudice **upon payment of all the settlement funds.**

… Littman[] will agree to issue a letter to [] Chasan that states as follows:

Dear Mr. Chasan, on February 5th, 2014, I published a letter copied to a number of individuals which alleged you were involved in witness intimidation in a criminal case in Montgomery County, Pennsylvania. It was a misunderstanding, and I apologize.

Now, the parties agree that this letter shall remain confidential, and [] Chasan will not disclose this letter to anyone for any reason.

However, if … Littman, or his law firm, disseminates any allegation that [] Chasan was actually engaged in witness intimidation, then that will be considered a material breach of the confidentiality clause and [] Chasan may publish the letter to refute those allegations.

The parties shall also agree to a joint statement that may be disclosed for any purposes that shall read as follows:

The parties fully disputed the claims arising in the matter of Freundlich and Littman, LLC[,] versus Bruce Chasan and the Law Offices of Bruce J. Chasan, LLC. The parties have agreed to amicably resolve their dispute; and in furtherance thereof, agree to the following:

[Littman] allege[s] that co-defendant [] Feierstein engaged in witness intimidation by filing a counterclaim against … Littman.

Feierstein defaulted and did not contest liability.

There was and is no evidence that [Chasan was] involved in any alleged witness intimidation engaged in by … Feierstein, nor was there any finding by the finder of fact that [Chasan was] engaged in witness intimidation.

The parties shall also, subject to negotiations between Counsel regarding the [S]ettlement [A]greement, [] **craft mutually acceptable language concerning the publication of the joint statement.**

It is the intentions of both parties that they shall not publish the joint statement on their firms['] respective websites or disseminate the joint statement publicly to any legal newspapers, the internet, things of that nature, but that **would be subject to further discussion among Counsel. If we cannot reach an agreement, we would ask that the [c]ourt facilitate resolving the dispute over appropriate language for that provision of the agreement.**

- 6 -

Finally, Your Honor, there will be some allowance for a non-disparagement clause but only again, **subject to further negotiations among Counsel as far as the specific language.**

It is the intention of [Chasan] that we do not wish to be subject to a potential breach of any non-disparagement clause by disseminating truthful information.

Again, to the extent that the parties are unable to reach an agreement on those terms, we may ask the [c]ourt to help facilitate resolving any such dispute.

Your Honor, we also ask that for the purposes of this record that the amounts of the settlement are sealed, but it will not be sealed from the [S]ettlement [A]greement. That will not be confidential.

N.T., 6/8/18, at 3-8 (some emphasis added; some emphasis omitted); ***see also id.*** at 10 (wherein Littman's counsel indicated that he had nothing to add regarding the terms of the agreement, as read into the record). The docket entry following the June 8, 2018, hearing states that the matter was settled after assignment to the trial judge, and the parties had settled after the jury was sworn and testimony had begun.

On September 24, 2018, Chasan filed a Petition to Enforce Settlement. Therein, Chasan alleged that on July 17, 2018, his counsel "transmitted to opposing counsel a written agreement memorializing the terms of the settlement reached by the Parties[,]" and that Littman's counsel returned a revision with redlined changes and comments. Petition to Enforce Settlement, 9/24/18, ¶¶ 16-17. Chasan argued that his counsel returned another revised agreement, but that, even after a conference call to discuss the disputed

terms, the parties were unable to reach an agreement. *Id.*, ¶¶ 18-20. Chasan therefore requested that the trial court enforce the settlement, and require Littman to execute the July 17, 2018, Settlement Agreement and joint statement. *Id.*, ¶ 22. Chasan argued generally that the parties had agreed to the material terms of the settlement on the record during the June 8, 2018, and that the Settlement Agreement was therefore enforceable. *See id.*, ¶¶ 64-86.

Littman filed a Response, arguing that the parties had not reached an agreement on **all** material terms. Response and Memorandum, 10/17/18, Response at 2 (unnumbered). According to Littman, the parties agreed to "almost all of the terms," but that they had not agreed to the content of the joint statement. *Id.* at 1-3 (unnumbered). Additionally, in Littman's Memorandum in support of opposition to the Petition to Enforce, Littman argued that, pursuant to the Settlement Agreement, the parties had agreed to a payment schedule, which provided for the first payment only *after* the parties had executed a mutually-acceptable release. *Id.*, Memorandum at 3-4 (unnumbered). On November 27, 2018, Chasan withdrew the Petition to Enforce. The trial court conducted a conference on December 4, 2018, after which the trial court advised the parties to continue to work toward reaching an agreement. *See* Trial Court Opinion, 9/28/20, at 1.[4]

---

[4] We note that there is no record of this conference in the docket.

On November 21, 2019, the trial conducted a status hearing. *Id.* At the time of the hearing, the trial court found that "[m]utual releases had not been signed[;] Littman had not paid Chasan[;] Chasan had not dropped his defamation suit—in fact, he had seen it through to its completion—and there had been no agreement about distribution of the joint statement." *Id.*; *see also* N.T., 11/21/19, at 6 (wherein Littman's counsel stated that Chasan had failed to discontinue the defamation action). During the hearing, Chasan's counsel specifically stated as follows:

> The settlement terms which were read into the record on June 8, 2018[,] specifically said that conditions of the settlement, among other things, required that the parties would formally memorialize the terms of their settlement into a written agreement which would include a mutual release of any and all claims arising out of [the] abuse of process case or the defamation lawsuit.
>
> To date, none of the parties have signed a written settlement agreement, [and] none of the parties have performed under the agreement. There's been no release signed.

N.T., 11/21/19, at 7-8. Chasan's counsel also stated, "We have not signed the settlement agreement and neither parties have [*sic*] performed pursuant to the settlement that was reached on the record in June 2018." *Id.* at 11-12.

Further, Chasan's counsel argued that in the June 8, 2018, Order, the trial court retained jurisdiction "in the event there was a dispute over the terms of the written [S]ettlement [A]greement that counsel wanted to address." N.T., 11/21/19, at 8-9. Littman's counsel countered that the trial

court had retained jurisdiction *only* as to dissemination of the joint statement, *i.e.*, under what circumstances the parties could release the joint statement. *Id.* at 26-27; *see also id.* at 26 (wherein Littman's counsel stated, "The only issue is … Chasan's alleged right to disseminate that joint statement to whoever he sees fit at whatever time he sees fit….").

At the close of the hearing, the trial judge stated his findings as follows:

> I retain jurisdiction to enforce the settlement. I find that because [] Chasan did not comply with discontinuing the defamation action, [Littman is] not required to make the payments that [he] said [he] was going to make. What I do still find enforceable is the joint statement.
>
> **We'll bring this back in a month** and I will impose sanctions, as necessary, if I believe either side has not in good faith worked towards that joint statement which shall include a non[-]disparagement clause.

*Id.* at 28-29 (emphasis added);[5] *see also* Trial Court Opinion, 9/28/20, at 1

---

[5] Throughout the hearing, the trial court observed that the defamation action had been fully litigated, and thus, the related term from the initial proposed Settlement Agreement could no longer be performed. *See* N.T., 11/21/19, at 16, 23, 25, 26.

(wherein the trial court specifically stated its conclusion that the Settlement Agreement was enforceable).[6]  Notably, the trial court did not memorialize its November 21, 2019, conclusion in a written order, nor did it otherwise indicate its findings on the docket.

On December 13, 2019, the trial court entered an Order, stating that "counsel is permitted to file a motion for reconsideration from my oral ruling on Thursday, November 21, 2019."  Order, 12/13/19.[7]  On December 23, 2019, Chasan filed a Motion for Reconsideration of the November 21, 2019, "Bench Order."  Chasan argued, in part, that Littman should be estopped from claiming that the Settlement Agreement is enforceable, after first arguing to the contrary.  Motion for Reconsideration, 12/23/19, at 2-3.  Additionally,

_____

[6] The trial court additionally voiced its frustration:

> I was expecting everyone to act as grown-ups and comply with their agreement.  That didn't happen, which is unfortunate.
>
> ….
>
> I fervently wish that I had not accepted a settlement and had let this case go to verdict.

N.T., 11/21/19, at 15-16.

[7] From the docket, it is unclear whether any party formally requested permission to seek reconsideration.  However, Chasan asserts that he attempted to file the Motion on Reconsideration on December 11, 2019, but was informed that no order had been entered on the docket.  Motion for Reconsideration, 12/23/19, ¶ 82.  Evidently, the trial court's solution was to enter an Order to permit the filing, rather than to enter the Bench Order on the docket.

Chasan claimed that the trial court erred by effectively rewriting the Settlement Agreement. *See id.* Littman filed a Response.[8] Following a hearing, the trial court denied Chasan's Motion for Reconsideration on January 14, 2020.

Chasan filed a Notice of Appeal on January 24, 2020. The trial court subsequently ordered Chasan to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and Chasan timely complied.[9, 10]

Chasan now raises the following issues for review:

1. Does the Superior Court have jurisdiction of an appeal from an undocketed bench [O]rder enforcing a mid-trial settlement (which [O]rder was adhered to in a later docketed written [O]rder denying Chasan's [M]otion for [R]econsideration), where Chasan had withdrawn his prior [M]otion to enforce settlement after Littman had opposed it on the basis that there was no agreement

_____

[8] Littman stated that immediately following the November 21, 2019, hearing, Littman's counsel informed Chasan's counsel that Littman had signed the joint statement, and Chasan's counsel replied that he had no intention of complying with the "Bench Order." Response, 1/12/20, at 1 (unnumbered).

[9] On March 26, 2021, Chasan filed an Application for Relief, seeking recusal of Judge Dubow, President Judge Emeritus Stevens, Judge Nichols, Judge Murray, President Judge Emeritus Gantman, and Judge McLaughlin. This Court granted the Application as to Judge Dubow, Judge Nichols, Judge Murray, Judge McLaughlin, and President Judge Emeritus Stevens, and denied the Application as to President Judge Emeritus Gantman.

[10] On March 3, 2020, this Court issued a Rule to Show Cause why the appeal should not be quashed, as the denial of reconsideration is not a final, appealable order. In Response, Chasan argued that, because the Bench Order had not been entered on the docket, it did not become appealable until the entry of the Order denying reconsideration. Alternatively, Chasan claimed that the Bench Order constitutes a collateral order. This Court subsequently discharged the Rule to Show Cause, and referred the issue to the merits panel for review.

on certain material terms, and the court imposed terms that the parties had not agreed upon?

2. Does the record support the trial court's finding in the Rule 1925(a) [O]pinion that Littman changed his position and was thus judicially estopped from asserting that the mid-trial settlement is enforceable?

3. Does the record support the trial court's finding in the Rule 1925(a) [O]pinion that Chasan did not breach the mid-trial settlement to dismiss his defamation lawsuit against Littman because Littman did not perform the prerequisites to Chasan's performance, namely: (a) sign the joint statement to the effect there was and is no evidence that Chasan was involved in criminal witness intimidation; (b) deliver a letter of apology to Chasan; and (c) pay Chasan $25,000?

4. Should the court's [B]ench [O]rder enforcing the settlement on modified terms different from what the parties had ostensibly agreed to in mid-trial (but later disagreed that there was agreement to all material terms) be reversed?

Brief for Appellant at 6.

As an initial matter, we must consider whether we have jurisdiction to address the merits of Chasan's claims. "The question of appealability of an order goes directly to the jurisdiction of the [c]ourt asked to review the order." *Barak v. Karolizki*, 196 A.3d 208, 215 (Pa. Super. 2018) (citation omitted). We recognize that "[a]s a general rule, an appellate court's jurisdiction extends only to review of final orders. An order denying a motion for reconsideration is not a final order and, thus, not appealable." *Oliver v. Irvello*, 165 A.3d 981, 983 n.1 (Pa. Super. 2017) (citations and quotation marks omitted).

- 13 -

Pennsylvania Rule of Appellate Procedure 341 defines final orders as follows:

**(b) Definition of final order.  A final order:**

(1) disposes of all claims and of all parties;

(2) (Rescinded);

(3) is entered as a final order pursuant to paragraph (c) of this rule; or

(4) is an order pursuant to paragraph (f) of this rule.

Pa.R.A.P. 341(b); **see also Barak**, 196 A.3d at 215 (explaining that "[a]n order is final ... if it prevents a party from presenting the merits of its claim in the trial court." (citation omitted)).

Chasan urges us to consider the November 21, 2019, Bench Order as a final order, because "its practical effect was to put him out of court."  Brief for Appellant at 31.  Upon review, we conclude that there is no final order of record.  The Settlement Agreement, as read into the record on June 8, 2018, expressly that the parties would continue negotiations regarding "mutually acceptable language" concerning the publication of a joint statement, as well as a non-disparagement clause.  **See** N.T., 6/8/18, at 7-8.  The parties also expressly requested that the trial court retain jurisdiction to oversee disputes regarding these ongoing negotiations.  **See id.**; **see also id.** at 5 (wherein the parties "ask[ed] the [c]ourt to retain jurisdiction … to resolve any dispute that may arise regarding the *finalization* of the [S]ettlement [A]greement terms." (emphasis added)).

- 14 -

The ensuing negotiations were unfruitful, and the trial court instructed the parties to continue working toward an agreement. On November 21, 2019, the case proceeded to an apparent status hearing. At the time of the hearing, the parties had not reached an agreement about the parties' rights to disseminate the joint statement, *i.e.*, one of the terms left open following the June 8, 2018, hearing. N.T., 11/21/19, at 26; Trial Court Opinion, 9/28/20, at 1. Additionally, the record reflects that the parties had not signed mutual releases. N.T., 11/21/19, at 7-8; Trial Court Opinion, 9/28/20, at 1. At the close of the hearing, the trial court indicated that the parties should continue working to draft the joint statement, and specifically stated that it would "bring this [case] back in a month…." N.T., 11/29/19, at 29. As the trial court itself stated,

> In all cases, but particularly those such as this one where there is a great deal of ill will, parties entering mid-trial into a prospective but **non-finalized settlement agreement** assume the risk that settlement will not be consummated and that they will be back to square one. This case can be considered Exhibit A for this proposition.

Trial Court Opinion, 9/28/20, at 3 (emphasis added).

Significantly, there is no order entered on the docket following this hearing from which an appeal could be filed. Further, even if an order had been filed, such order would not be final, as the court's decision did not fully dispose of all claims and parties or prevent either party from presenting the

merits of his claims.[11] **See** Pa.R.A.P. 341(b); **Barak**, 196 A.3d at 215. Thus, this appeal was not properly filed from a final order.

Alternatively, Chasan argues that the Bench Order is appealable as a collateral order. Brief for Appellant at 38. Chasan claims that the Bench Order is separable from the main cause of action, because a settlement agreement is not an adjudication of the merits of a claim. **Id.** at 40. Chasan additionally asserts that the Bench Order "effectively deprived Chasan's [*sic*] of his fundamental constitutional right to defend himself against Littman's claims at a jury trial." **Id.** at 41. Finally, Chasan argues that if this Court declines to exercise jurisdiction, there will be no judgment from which the parties may appeal. **Id.**

Pennsylvania Rule of Appellate Procedure provides as follows:

**Rule 313. Collateral Orders**

**(a) General rule.--**An appeal may be taken as of right from a collateral order of a trial court or other government unit.

**(b) Definition.--**A collateral order is an order separate from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

Pa.R.A.P. 313.

To satisfy the collateral order doctrine, the appellant must demonstrate that the order 1) is separable from and collateral to the main cause of action; 2) involves a right too important to be

---

[11] For similar reasons, the Order denying Chasan's Motion for Reconsideration also cannot be considered a final order.

- 16 -

denied review; and 3) presents a question that, if review is postponed until final judgment in the case, the claim will be irreparably lost. The first prong, separability, occurs when we can address the issue surrounding the disputed order without analyzing the ultimate issue in the underlying case. As for the second prong, importance, it is not sufficient that the issue be important to the particular parties. Instead, the issue must involve rights deeply rooted in public policy going beyond the particular litigation at hand. We must interpret the collateral order doctrine narrowly, and each of the above prongs must be clearly present for us to deem an order collateral.

*Cabot Oil and Gas Corp. v. Speer*, 241 A.3d 1191, 1196-97 (Pa. Super. 2020) (citations and quotation marks omitted).

Instantly, the Bench Order is separable from the main cause of action, as it relates to the Settlement Agreement, rather than the merits of the abuse of process action. *See id.* at 1196. Regarding the second prong, our Supreme Court has previously rejected a contention that "the right to avoid trial on account of a settlement agreement is important enough for immediate appeal…." *Geniviva v. Frisk*, 725 A.2d 1209, 1214 (Pa. 1999). The Court stated that "it likewise defies common sense to maintain that allowing appeals as of right from orders denying enforcement … or … denying approval of a settlement agreement, promotes the 'efficient, expeditious and judicious resolution of disputes.' Any efficiencies gained in reduced trial litigation would be at the expense of increased appellate litigation." *Id.* (footnote omitted). Further, Chasan's claim would not be irreparably lost, as the trial court has not yet issued a final order. Accordingly, the November 21, 2019, Bench Order is not appealable as a collateral order.

Appeal quashed.

Judge Stabile joins the memorandum.

Judge Bowes files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/14/2021